JAMES M. WHITE and STELLA WHITE, Appellants,
v. F. H. THWING, ROBERT SOHLBERG, D. T.
RILEY and J. T. RILEY.

In Banc, November 20, 1923.

1. **SALE OF OIL STOCKS:** On Faith of Market Price: False Representations of Value: Reliance. Where the purchaser of oil stocks, a seasoned business man, admits that he failed to inquire as to many of the important elements that entered into its value—the acreage of the leases, the royalties to be paid, the number of wells, their age, their location, the prospects for new wells, drilling and development costs, and such matters—but bought a large block of stock at its current market price, about the time a well was sunk to what was currently reported a great lake of oil and which at first produced immense quantities, but later much less amounts, and induced the seller, who had been an officer of the company and was still a large owner of its stock, to sell stock to him on time, and gave his note therefor, and afterwards visited the properties and then bought another large block of stock at the then reduced market price, and the first note being surrendered executed a new note for the agreed price of both purchases and secured it by a deed of trust on a near-by lease of his own, and made no complaint that he had been deceived until the note became due, testimony by him that the seller at the time the purchase was made

(680)

represented that the entire capital stock except about one-fifth was entirely paid up and that it had no debts except for current monthly operating expenses, whereas it had a debt equal to about one-third of the par value of its capital stock, is not sufficient to justify a cancellation of the note, for the purchase was made on the faith and basis of the market price of the stock, and not in reliance upon the representations.

2. ————: On Credit: Conversion: Not Pleaded. Where the petition for the cancellation of a note given for the purchase of certificates of stock does not proceed on the theory of conversion or set-off, the question whether the purchaser is entitled to a credit for the amount realized from a re-sale of the stock by the vendor before the note became due is not in the case; particularly so, where the evidence shows that the great bulk of the stock was re-sold after the note became due and the proceeds credited, and the evidence is strongly conflicting on the question whether there was a prior sale.

3. ————: Blue-Sky Law: Application. The Blue-Sky Law (Secs. 11919 et seq., R. S. 1919) has no application to the sale of the stock of a company which is not an investment company within the meaning of the statute. Nor does it apply where the stock sold was that of a company which sold only oil, and the legal title of the stock was in the name of and the stock was sold by an individual, who was a stockholder of another company, which was the equitable owner of the stock, but not an investment company.

4. LEGAL OWNER OF NOTE: Right to Sue for Equitable Owner: Counterclaim. The legal owner of a note given to him as payee in payment for the purchase of oil stocks may sue on the note and enforce the security on behalf of the equitable owner, and when the maker sues him for a cancellation of the note on the ground that it originated in fraud, he can by his cross-bill pray for judgment on the note and for foreclosure; and although the evidence develops that the note in part belongs to a corporation which is not made a party, if the maker's suit for cancellation goes to the whole note and all the security, the legal payee may enforce the obligation in all its parts, for himself and the equitable owners.

5. JOINT JUDGMENT: In Favor of Several Owners. In a suit by the maker to cancel a note brought against several owners, who by their cross-bill ask for judgment on the note, a joint judgment in favor of all the defendants, without a finding of the amount respectively due each of them, is not erroneous. The plaintiff is not aggrieved by a failure of the judgment to apportion the fund among the defendants who collectively own every interest in the note and its security. [Distinguishing Rumsey v. People's Ry. Co., 144 Mo. 175.]

Appeal from Jackson Circuit Court.—*Hon. Clarence A. Burney,* Judge.

AFFIRMED.

*I. J. Ringolsky, M. L. Friedman, Wm. C. Boatright* and *Ringolsky & Friedman* for appellants.

(1) The preponderance of the credible testimony in this case shows that Thwing made many material misrepresentations to White to induce him to execute the $45,000 note and deed of trust, and these representations were relied on by White. These representations were inducing causes of the alleged purchase and White is entitled to rescission. Cahn v. Ried, 18 Mo. App. 115; Lumber Co. v. Dent, 121 Mo. App. 108; Friend v. Jones, 185 S. W. 1159. (2) Equity cases are to be tried *de novo,* and this court is bound to conform its findings of fact to the preponderance of the credible testimony, and is not bound by the findings of the trial court where important witnesses testified by deposition. Allen v. Logan, 96 Mo. 591; Dalrymple v. Craig, 149 Mo. 345; Wilson v. Wilson, 256 Mo. 541; Walsh v. Walsh, 226 S. W. 236; Luke v. Atkinson, 265 Mo. 118; Lins v. Lenhard, 127 Mo. 281; Guthrie v. Ball, 228 S. W. 889; Hickman v. Nathan, 229 S. W. 176; Ford v. Laughlin, 226 S. W. 911; Scott v. Barton, 226 S. W. 958; Blake v. Thwing, 185 Ill. App. 187. (3) The alleged sale of 22,000 shares of Union Oil stock to White is absolutely void, because made in violation of the Blue Sky Law. Sections 11919 to 11931, R. S. 1919; Elliot on Annotated Blue Sky Laws of United States, p. 19; Reed and Washburn, Blue Sky Laws, pp. 12-14; 77 to 80; Hall v. Geiger-Jones, 242 U. S. 539. (4) An executory contract made in contravention of a penal statute cannot be enforced. Edward v. Ioor, 172 N. W. 620; Downing v. Ringer, 7 Mo. 585; O'Bannon v. Widick, 198 S. W. 433; United Shoe Co. v. Ramlose, 231 Mo. 532; Reichardt v. Hill, 236 Fed. 817; Reed and Washburn, Blue Sky Laws, p. 19. (5) Where a pledgee of stock deposited as collateral security converts same, the pledgor is entitled to an equitable credit, when suit

is brought for the indebtedness, of the amount realized from the unlawful sale and conversion of the collateral, the measure of damages being the highest market price obtainable at the time of conversion.  31 Cyc. 840-846; Bulkeley v. Welch, 31 Conn. 339;  Dimock ·v. Bank, 55 N. J. L. 296;  Brown v. Bank, 132 Fed. 450;  Griggs v. Day, 158 N. Y. 1;  Early Co. v. Oil Mills, 208 S. W. 224;  ·Dibert v. Wernicke, 214 Fed. 673;  Commonwealth v. Althouse, 207 Mass. 33;  Richardson v. Ashby, 132 Mo. 238;  Neidus v. Moore, 221 Mo. 361.  (6) The note, the collateral securing the same, and the need of trust sought to be counterclaimed by respondents, belonged not only to them, but to other parties not in court, and on which a several judgment could not be rendered, and hence the same could not be pleaded as a counterclaim against suit brought by the plaintiffs.  Miller v. Crigler, 83 Mo. App. 395;  Sec. 1233, R. S. 1919;  Muldrow v. Railroad, 62 Mo App. 435.;  Butler v. Boynton, 117 Mo. App. 465; Clark v. Gable, 21 Mo. 225; Russell v. Lynch, 28 Mo. 312; McLaren v. Wilhelm, 50 Mo. App. 658;  Seay v. Sanders, 88 Mo. App. 486;  Upham v. Allen, 76 Mo. App. 206; Fulkerson v. Davenport, 70 Mo. 542;  Forest Company v. Hall, 216 S. W. 740;  34 Cyc. 715, 719, 727.  (7) A judgment of foreclosure which does not find the exact amount due to all parties interested is void.  Rumsey v. People's Co., 144 Mo. 175.  (8)  The note and mortgage belonged to the Evans-Thwing Refining Company, H. M. Evans and Eppley, in addition to respondents.  These three owners were not parties to the action, and the judgment for foreclosure is void.  All parties having an interest in the mortgage should have been joined.  Sec. 2232, R. S. 1919;  27 Cyc. 1564.  (9) There was no sale of stock to White.  Thwing did not appropriate the stock or set it off to White, or assign or deliver same. Grocery Co. v. Clements, 69 Mo. App. 448;  George v. Dean, 17 Mo. App. 332.;  Boyer v. Company, 187 Mo. App. 523;  Longdorff v. Myers, 171 Mo. App. 255;  35 Cyc. 191, 315.  (10)  The Evans-Thwing Refining Company is a Missouri corporation and had no authority to own or

sell stock in the Union Oil Company, a corporation. Any executory sale to White was void and he is entitled to rescission. Oil Co. v. Furniture Co., 73 Mo. App. 135; State ex rel. v. Bank, 197 Mo. 600; State ex rel. v. Railroad, 241 Mo. 1.

*R. R. Brewster, Edward Ellison, Strop & Mayer* and *McCune, Caldwell & Downing* for respondents.

(1) While this court declares both the facts and the law in equity cases, yet deference is paid to the findings of the chancellor, and his findings are not lightly disturbed where the facts are close and the evidence conflicting, and where, as in this case, the evidence is largely, though not wholly, oral. Craddock v. Jackson, 223 S. W. 929; Welsh v. Veasley, 227 S. W. 58; Schulz v. Bowers, 223 S. W. 725; Soehngen v. Jantzen, 222 S. W. 402; McFarland v. Bishop, 282 Mo. 547; Walsh v. Walsh, 226 S. W. 242; Gibson v. Shull, 251 Mo. 485; Futhey v. Potts, 204 S. W. 181. (2). To justify the cancellation of a deed of trust upon real estate for fraud, the proof must be so clear, convincing and complete as to exclude any reasonable doubt. Appellants' evidence in this case does not measure up to that standard. Bross v. Rogers, 187 S. W. 38; Jackson v. Wood, 88 Mo. 76; Bryan v. Hitchcock, 43 Mo. 527. (3) The sale to White was not prohibited by the Blue-Sky Law. The Union Oil Company was not connected with the sale in any manner, had no interest whatever in the stock, and received no benefit therefrom. Thwing was the legal owner of the shares, was the vendor, and was not within the inhibition of the statute. The Evans-Thwing Refining Company had only an equitable interest in the stock, but if considered the owner, acting through Thwing in the sale, still such action was not governed by the statute and was not unlawful. The Missouri Blue Sky Law, unlike the acts of some of the other states, was intended to apply only to the sale of stock which was being sold for the purpose of financing or promoting the company issuing the stock. Not even inferentially does the act prohibit the sale by

either a corporation or an individual of stock owned by such corporation or individual, unless the stock was issued by the corporation selling it. (4) There is no question of equitable set-off in the case. Appellants could not avail themselves of an equitable set-off unless they pleaded it. Equitable set-off was not pleaded in any manner whatever. R. S. 1919, sec. 1153; 24 R. C. L. p. 875, sec. 82; 19 Ency. Pl. & Prac. p. 751, sec. 3; Neosho City Water Co. v. City of Neosho, 136 Mo. 498; Spink v. Mueller, 78 Mo. App. 94; 31 Cyc. 697. (5) Even if appellants had pleaded a conversion of the stock as an equitable set-off, the burden would have been on appellants to establish the conversion. The appellants not only failed to show a conversion but the evidence affirmatively shows there was no conversion. (6) There is no defect of parties affecting the validity of the decree. Defendants were the legal holders of the note and authorized to maintain the cross petition in their own names. R. S. 1919, sec. 837, 980; Carter v. Butler, 264 Mo. 326; Beattie v. Lett, 28 Mo. 596; Overall v. Ellis, 32 Mo. 322; Springfield to use v. Weaver, 137 Mo. 670; Barber v. Stroub, 111 Mo. App. 57. (7) If there was any defect of parties to the cross-petition, which we deny, such defect was waived. R. S. 1919, secs. 1230, 1237, 2227; Scott-Force Hat Co. v. Hombs, 127 Mo. 392; Johnson v. United Rys., 247 Mo. 357. (8) The decree is not erroneous in failing to find the amount severally due to each defendant. The indebtedness was evidenced by a single note, and the amount due thereon was found by the court. The case is not one where various notes or bonds held by different persons are secured by one instrument, and the duty of finding the amount due to the holders of the various notes is left to others, as was Rumsey v. Railway Co., 144 Mo. 175. Barnes v. Railroad, 112 N. E. (N. Y.) 929; Handly v. Snodgrass, 9 Leigh, 491; Wheeler v. Hawkins, 116 Ind. 523; Insurance Co. v. Landfare, 76 N. W. (Neb.) 1072; School Dist. v. Edwards, 49 N. W. (Wis.) 969. (9) The sale to White was a completed sale *in praesenti*, as evidenced by the recitation of pledge con-

tained in the note and the receipt taken from Thwing. Beardsley v. Beardsley, 138 U. S. 262, 34 L. Ed. 928; Brigham v. Mead, 10 Allen (Mass.) 247; Currie v. White, 45 N. Y. 829. (10) Thwing was not required at all times to keep on hand any particular certificates of stock for delivery to White, so long as he at all times was able to deliver to White the number of shares pledged. Berlin v. Eddy, 33 Mo. 430; 31 Cyc. p. 855, 856; 14 C. J. 736; Thompson v. Toland, 48 Cal. 116; Atkins v. Gamble, 42 Cal. 101; Hayward v. Rogers, 62 Cal. 348; Hubbell v. Drexel, 11 Fed. 115; Carlisle v. Norris, 215 N. Y. 400, Ann. Cases 1917A, 429; Note Ann. Cases 1915B, 911. (11) Whether or not Evans-Thwing Refining Company had the right to own stock in the Union Oil Company is not an issue in this case. No right to rescind because of alleged *ultra vires* act is claimed in appellants' bill, and to be availiable such ground of rescission must be pleaded. 14A, C. J. 842; Y. M. C. A. v. Dubach, 82 Mo. 475; Glendale Lumber Co. v. Beekman Lumber Co., 160 Mo. App. 623. The charter of Evans-Thwing Refining Company not having been introduced in evidence it cannot be ruled that an oil refining company may not own stock in an oil production company. State ex inf. v. Railroad, 241 Mo. 1.

JAMES T. BLAIR, J.—Appellants brought this suit to secure the cancellation of a note and certain assignments of a lease and a deed of trust thereon given to secure the note. The grounds set up are that the execution of the several instruments was induced by fraudulent representations. Respondents filed a cross-bill praying judgment on the note and for foreclosure. The trial court rendered judgment as prayed in the cross-bill, and this appeal followed. Appellants contend the judgment must be reversed for several reasons, one of which is that the finding is wrong on the facts. This will require some details of the evidence which covers many hundreds of pages.

The note in question was given for the price of 22,000 shares of Union Oil Company stock which appellant

James H. White purchased.  The petition alleges that to induce White to purchase the stock, respondent Thwing falsely represented to him that (1) the capital stock of the Union Oil Company in the sum of $1,500,000 was fully paid and non-assessable; (2) the "whole of the capital stock was paid up in full in good faith with cash and property actually worth the amount of the capital of" the company; (3) "the company was not indebted in any sum except small monthly obligations for work, labor and supplies" and "could pay all its debts on demand;" (4) the company "then had a daily production of oil from its wells of over 1800 barrels per day,   .   .   . then being sold at the prevailing market price;"  (5) "Well No. 18 on Denny lease was in a lake of oil thirty-seven feet deep and didn't know how wide it was but knew it was large;"  (6)  "said Union Oil Company was then the owner of leases to 80,000 acres of good oil- and gas-producing land in Kansas."  It is then alleged that White knew nothing of the condition of the company and relied upon Thwing's representations and bought the stock and gave the notes and security on the faith of them; that all representations were false.  It is also alleged that Thwing was engaged with others in a stock jobbing business "principally for the purpose of defrauding people in Kansas City, including" appellants.  The petition alleges in detail the facts and circumstances asserted to have accompanied the execution of the note in suit and one for a less sum previously executed.  Further reference to the petition may become necessary in another connection.

White is a man of intelligence and energy and of wide experience and pronounced success in the business world.  He had lived in Kansas City thirty-seven years and was about fifty-five years of age at the time of the transactions in question.  He was first in the furnishing-goods business and later organized the Baltimore Shirt Company, which operates three stores in Kansas City. He has bought and sold stores.  He established one man in the wall-paper business and was interested in a shoe

business at one time. He dealt extensively and successfully in real estate. He helped promote and build and is part owner of the Elms Hotel at Excelsior Springs. He owns the Washington Hotel, the White Hotel and a half interest in the Dreyfoos Hotel, in Kansas City, all large and valuable properties. His interest in the last of the last three is worth $100,000. He owns other real estate. He took a little flyer in the Joplin zinc district at one time, and once assisted in promoting a life insurance company in Kansas and became half owner of it. He says he owns property worth about a quarter of a million dollars in addition to his interest in the Baltimore Shirt Company. In his list are 2925 acres of Texas land, acquired in 1910, which he has taken off the market because there is some indication of oil. In the fall of 1917 White and King, one of his witnesses, organized the Towanda-Eldorado Oil Company. They first bought a lease on 320 acres of land in Butler County, Kansas, for $50,000. Each put up $5,000 in cash, and the balance they borrowed on their note. They also agreed to pay $20,000 additional for the lease, in oil, if oil was struck. Their next step was to sell one-half interest in the lease to a Denver group for $80,000, and then the two interests joined and formed the company named, and put in the 320-acres lease in full payment of the capital stock of $1,000,000. This was in October or November, 1917. The 320-acre lease thus capitalized adjoined one of the leases of the Union Oil Company, the Sargeant lease, and is about two miles from the Denny lease of the Union Oil Company, which plays an important part in this case. White visited the 320-acres lease in 1917.

The Union Oil Company was organized in January, 1917, and incorporated March 2nd of that year. Its offices are located at Wichita, Kansas. Mr. F. C. Hoyt early in 1917 owned or held options on leases covering approximately 80,000 acres. In some of these leases he had associates. Thirty-six hundred and seventy-three acres of these, or about five and three-fourths square miles, were in Butler County, which was the scene of much of the oil

development at the time, and wherein were located the Shumway wells which were producing or had produced oil in enormous quantities. A great number of other wells were then producing. The remaining leases covered land, in the main, in counties adjoining or near Butler County. Much of the land under lease was promising, but much of it was clearly not so. The Union Oil Company was incorporated for $1,500,000. The shares had a par value of one dollar. For his leases, which were made over to the company, Hoyt received 1,150, 000 shares of the stock. The balance, 350,000 shares, became treasury stock and was subsequently sold. The company afterwards expended $50,000 in acquiring additional leases. One forty-acre lease so purchased "was located within a baseball throw of big production" according to the vice-president and treasurer of the company. The Hill lease, acquired from Hoyt in the first lot, was just across the road "from production." Two wells nearby were producing about 300 barrels apiece. This lease alone cost Hoyt or his backers $277,000. The Denny lease was about one mile from the Shumway wells, two of which produced 15,000 barrels each per day. The Hill lease was at the center of original oil production in Butler County. In March, 1918, there were seven producing wells on the Denny lease, and seven deep wells and fourteen shallow wells on the Hill lease. These shallow wells averaged about fifty barrels per day, according to Mr. Jordan. Drilling was proceeding on the Sargeant lease with good prospects, and Well No. 18 was being drilled on the Denny lease. Gas was being produced which yielded a cash return of $3,000 or $4,000 per month, and Jordan states that several other leases "had good promise." Twelve or fifteen brokers in Kansas City were buying and selling oil stock. No. 18 Denny did not begin producing oil until several days after March 6, 1918. The well was bought in on the 18th of March. The brokers' records show that Union Oil Company stock was selling at about two dollars per share on March 8, 1918. On March 9th the sales ranged from $2.75 to $3.70. One broker on that day sold 6600 shares at an

300 Mo.—44

average price of $2.89. A dozen or more brokers were handling the stock. These were actual sales, according to those of the brokers who testified. It was the price as thus fixed to which White referred when in his testimony he spoke of the market price. No. 18 Denny was doubtless playing its part in this, though not yet actually producing oil, since some information about what was happening there seems to have reached the city. At a depth of about 2450 feet the sand was struck, and when a few inches deeper had been reached the tools were thrown upward five hundred feet. The cable broke. The tools fell back, some swab heads were pulled off in the hole and it sanded up. This trouble delayed actual flow, but promised much. The daily papers began to tell of the well. On the 19th of March they forecast a production of 10,000 gallons per day or more, and gave the new well and its promise much publicity. Union Oil stock responded from a slight slump from the 13th to the 15th of March and began to sell around three dollars per share. Thereafter it fell away somewhat until on the 26th the "market price" was $2.50 per share. On and near that date its indebtedness was about $475,000. This included current bills in a considerable sum. The rest was represented by loans. The daily production ran about 900 to 1000 barrels.

Kelly was a real estate man. His firm was Kelly & Hoyt, with offices on the same floor with Thwing and the Evans-Thwing Refining Company. The company negotiated loans on commission. Kelly and Thwing were acquainted, and Kelly knew Thwing or his company had some Union Oil stock. In fact, Kelly had bought some of that stock through Thwing. Kelly also knew White. King, a witness for appellants, now residing in Minneapolis, had been in the oil business for some time. One of his principal activities was to buy leases and then interest others in them and dispose of them. He was White's partner in the purchase of the 320-acres lease which fruited to the one-million-dollar Towanda-El Dorado Oil Company, a mile and a half from the Denny lease.

Thwing had been a farmer as a young man and then a merchant. Subsequently he was engaged in banking in Kansas. The bank failed. Thereafter he was in the real estate business in Oklahoma City, and afterwards in the mercantile business in Guthrie. About 1903 he moved to Kansas City. He and Evans, about 1904 or 1905, joined forces and erected some buildings on leaseholds they procured. About 1912 Evans and Thwing organized the Ponce Refining Company. Early in 1917 they organized the Evans-Thwing Refining Company. It built an oil refining plant in Kansas City, and one in Wichita, afterwards removed to Fort Worth. Its capital was $1,-000,000. Evans and Thwing owned about $570,000 of this. Evans and Thwing and the Evans-Thwing Refining Company invested $356,350 in stock of the Union Oil Company, about the time of the organization of it. For this they secured 663,800 shares. For 500,000 shares they paid F. C. Hoyt $250,000. They then bought, it seems, 62,500 shares of treasury stock at par, and received from Hoyt an equal amount as a bonus under some arrangement with him. The remainder seems to have been bought at par. The evidence tends to show that the stockholders of the Evans-Thwing Refining Company, other than Evans and Thwing, were then offered Union Oil stock at par in amounts equal to their stock holdings in the Evans-Thwing Refining Company. How much was sold this way does not appear. Kelly purchased on this offer. The stock was the property of the Evans-Thwing Company, but held in the name of Thwing on the theory that the company could not hold the stock of another corporation. Thwing was at first vice-president and a director of the Union Oil Company, but in a short time retired from both these positions. The Evans-Thwing Refining Company had a contract to buy all oil produced by the Union Oil Company. Deliveries were made as oil was produced and payments therefor made accordingly.

White says that about February, 1918, he began negotiations with Kelly for a loan of $30,000; that he wanted to "use it in different things, in my business and

other purposes:'' that he was ''going to buy a little Lucky Tiger stock—did buy some, and thought I would buy a little more,'' and that he needed money at the hotel and was doing some building and could ''always use money.'' Kelly says White asked him to get the loan sometime in March and that White seemed in a hurry, and when asked the reason for that said he might want to buy a little Union Oil stock. Kelly then approached Thwing, 'who was not a money lender and from whom Kelly had never before procured a loan, and ask him to loan White $30,-000, he says. Thwing said he wasn't interested. Kelly explained that White wanted to buy Union Oil stock and asked Thwing if he would sell White some stock ''and take collateral for security.'' Thwing said he would think it over. Later Thwing, according to Kelly, said to see what White wanted. Kelly advised White that Thwing ''would consider selling him some oil on time and taking his note'' will collateral, and then arranged a meeting. In this Kelly represented White and collected from him a commission for securing the loan. Kelly had owned, bought and sold some Union Oil stock. He had taken 1000 shares at par on the Evans-Thwing offer and sold it in February, 1918, at $2.60. He bought more at $3.02 one-half in March. He owned 1500 shares at the time the White transaction occurred, and the daily reports to stockholders which covered production by the company and the condition of the No. 18 Denny well were mailed to him. Like the rest, Kelly states this strike caused great excitement in Kansas City. White at first denied that when he first sought a loan through Kelly he had in mind the purchase of Union Oil stock, but later said that Kelly's testimony about the matter was correct ''possibly to a certain extent.'' Thwing testified that two or three weeks before the consummation of the first transaction on March 25, 1918, Kelly asked him if he would sell White some stock on other security and deliver the stock. He testified he refused to agree to deliver the stock that way, and that a day or two later Kelly asked, in substance, if he would make the deal and hold

the stock with the other collateral. This Thwing agreed to do if the security was good. He went and examined the property offered as security, and was furnished an abstract, which was examined. White wanted ten or twelve thousand shares. So far as our examination shows neither White nor Kelly asked about the price. It was evidently taken for granted that the market price would govern. No inquiry was made of Thwing or any other person, in advance of March 25, 1918, concerning the company or its assets, debts or condition, so far as the evidence shows. On March 25, 1918, White went to Kelly's office. He and Kelly and King say he was accompanied by King. Kelly called Thwing into the office. According to White, Kelly "introduced us, and he says, 'Now, Mr. Thwing, here is Mr. White and Mr. King and Mr. White desires—he thinks he will buy some Union Oil, and has this property down to the stockyards, which he will put up as collateral, and you can ask him any questions you like and see if you can make the deal.'" White says Thwing replied he "would do it if everything is all right," and proceeded to question him about the leasehold; that Thwing then said he would sell him, White, the stock at $2.50, the market price that day, on a four-months' note and take an assignment of the lease as collateral. White says he went expecting to buy at the market price. White says he then asked Thwing what the capital stock of the Union Oil Company was, and Thwing said it was $1,500,000. White says he inquired whether it was all paid up and that Thwing replied, "Yes, with the exception of about—there was $250,000 or $300,000, he forgot which, exactly—taken in leases when they formed the company, and it was all paid up." White says he then asked what the production of the wells was, and Thwing said, "Well, of course, this big well—the 18 on the Denny, I don't know exactly what that is going to be, but it is a very big well. Outside of that the production is 1800 barrels average daily—per day." White says he then asked what the acreage was, and Thwing replied: "We have about 80,000 acres, more

or less; maybe a little less than that now, because I understand they have given up some of the leases.'' That he then asked, ''How is the financial condition of the company,'' and Thwing answered: ''Well, the current bills possibly amount to somewhere in the neighborhood, to a little less than $100,000, taken care of from month to month, which all companies operating that way have, more or less.'' There was further talk, he says, about the Denny well, and Thwing said, ''They had struck a lake of oil down there but the tools were in the well and they were trying to fish them out'' and lost some rubber swabs in the well and were ''having hard luck;'' that the lake was thirty-seven feet deep; that the company had on hand practically enough cash to take care of all current bills. White said he then said, ''All right, Mr. Thwing, we'll make the deal if that is satisfactory,'' and Thwing said, ''All right,'' and Kelly was told to draw up the papers.

King—whose deposition was read and whose presence at Kelly's office Thwing denies, and Kelly corroborated White in a general way, though their testimony is not entirely harmonious—King says he and White were already in oil together in Butler County and their company was then drilling; that White came to him and ''explained about this big well'' on the Denny lease having come in and wanted to buy some stock—Union Oil stock. King said he would consider it and did agree to go in, and accompained White to Kelly's office on March 25, 1918. King says that Kelly told Thwing that he, King and White were there with a view of buying some Union Oil stock. He says he let White do the talking. He had previously visited the Denny lease and had seen the ''big well.'' King did not go into the trade, finally. He says he suspected Thwing was unloading, and since he knew Thwing was on the inside with the Union Oil Company, he stayed out. He told White this before the papers were signed, but White went ahead.

Thwing does not remember that King was present at all on March 25, 1918, at Kelly's office. He says Kelly

came and said they were ready to fix up the papers; that he went in and White desired to use a form of assigment of the leasehold which he had used in other transactions, and that this was the question uppermost; that there might have been some discussion about the property the lease was on and encumbrances on it, but he was in Kelly's office only five or ten minutes and returned to his office, and the papers were drawn. He denies that White made the inquiries concerning the Oil Company and its condition which White says he made. According to his testimony the question up concerned the matter of satisfying him with the transfer of the property put up to secure the note. He had examined the property and the title.

During this period the trading in Union Oil was very active, and the price went, at times, much above $2.50. Rickey, the president of the company, on March 15, 1918, bought one block of 10,000 shares at three dollars. During April trading in the stock was heavy and the price dropped as the Denny lease well began to show that it might not be relied upon to realize all the hopes rumor had aroused. It produced oil, first in large quanties, relatively, and then in decreasing amounts. It was still producing a small amount daily when the case was tried. After March 26, 1918, White visited the Denny well and the Union Oil Company's offices at Wichita. Just before May 1, 1918, at the suggestion of Mr. Hoyt, Kelly's partner (not connected with F. C. Hoyt), White concluded that he ought to buy some more Union Oil stock at the then lower price of $1.50 to aid in recouping his apparent loss on the first purchase. Hoyt then went to Thwing and told him that White had paid a good price for the first block and suggested that Thwing could afford to sell White more stock at the then lower price. Thwing consented to do so. Hoyt turned the matter over to Kelly, who closed the second sale from Thwing to White. The number of shares was 10,000, and the price $1.50 per share, the market price. The first note and assignment were canceled, and on May 1, 1918, a new six-months' note covering both sales ($45,000) was made out and a

second assignment of the leasehold given by White to Thwing. A few days later a deed of trust was substituted for the assignment. Hoyt's firm was paid a second commission by White for the "loan" thus secured for him from Thwing. White says that on this occasion he again asked Thwing if everything was about the same as before, and Thwing said it was. White says he relied on the same representations, thus renewed, in this second purchase. Meanwhile Kelly had bought some stock, and he, also, is suing and being sued, and he seems to be relying on the representations he says he heard Thwing make to White. White testified that the value of an oil company's property could be fairly computed in dollars by multiplying its daily production expressed in barrels by two thousand. He said the acreage was of no real importance, and that the number of wells cut but little, if any, figure. He said he had never met Thwing before March 25, 1918, but that he took his word and bought the stock on his confidence in him and "absolutely believed in his veracity." He said he did not inquire whether any of the Union Oil Company's leases were encumbered and did not ask what royalties were being paid; did not ask how many wells had been drilled and didn't know how many; that he made no inquiry why a company with $1,-150,000 paid in in cash, as he inferred, should have a floating indebtedness of $100,000, and did not inquire what had become of the $1,150,000 he had inferred had been paid in cash. He made no inquiry concerning the cost of the company's drilling and development operations; did not ask concerning the number of wells producing, nor concerning the age of these wells. There is no evidence that he inquired concerning their location, or the location and prospects on the leases the company so far had not attempted to develop. As a matter of fact over $250,000 had been expended in drilling, and the machinery, casings, etc., on hand (in August, 1918) inventoried about $502,000. Just what part of this was in the account by March 25th or May 1, 1918, is not shown.

The daily reports to the stockholders were detailed

and gave the daily production of the twenty-eight producing wells during March and April, 1918.   There were about 700 stockholders.   During the last eleven days of March, 1918, the average production was 1077 barrels. The average in April, 1918, was 928.   As stated, it is shown that Thwing had all this information, as did Kelly and 700 others, through the daily reports, and Evans-Thwing Refining Company had it through their purchases of the oil.

It is obviously impossible to state all the details of the evidence in this record.   The above gives a view of many inportant points.

I.  White's testimony that the acreage is not important eliminates the charge that this was misrepresented. Whatever the truth, it shows White gave it no weight. The trial court refused to believe the testimony that Thwing represented and appellant believed that the daily production was 1800 barrels on March 25, 1918, in addition to the production from the No. 18 Denny well.  This well was heralded through the press and the streets as a second Shumway.   According to White the 1800 barrels daily production outside 18 Denny established a value of $3,600,000 for the property or $2.40 for the capital stock.   This is without regard to the 75,000 or more acres of leases, much in promising territory, which had not been drilled; does not include any of the $1,150,000 cash capital White says he was led to believe was paid in; takes the property as practically unencumbered except by current bills, and includes nothing for the new well which had already flowed for periods at the rate of 400 barrels per hour and which the company, its superintendent, the press and the man in the street believed and were proclaiming to be an asset of great actual value. Mr. Jordan, treasurer of the company and active in its management, says a fair estimate of this well at the time was a production of 1500 barrels a day for a considerable period.   He and the superintendent believed it probable

*Purchase on Faith of Market Value.*

that a lake of oil had been struck, as happened in wells of the kind, and a statement to that effect had been issued. Tested by experience; that was what the performance of the well indicated. Appellant's testimony amounts to a claim that all these things, on the oil stock market in Kansas City in March, 1918, were covered by the difference between $2.40 per share, representing, according to his figures and belief at the time, the value of 1800 barrels daily production, and $2.50 per share, which was the conceded market value on March 25, 1918—ten cents a share. Thwing and White were both seasoned business men. They were not previously personally acquainted, but each knew of the other and each knew the other to have been largely successful in business matters. According to appellant, Thwing was concocting a story with which to deceive him and unload upon him a large block of stock at a false price. He asserts he was deceived by the story Thwing told. He then relates a story, which he says he did not doubt but acted upon, which if true disclosed that Thwing was letting him have the stock at a value which represented, in effect, if true, the daily production of twenty odd small wells, and was making him a present of the other 75,000 acres of leases and what seemed to be the promise of unusual profit from the only big well the company had, so far as these values would be represented by 12,000 shares of stock. The nature of the oil business is such that it lends emphasis to this. It was a weird story for one seasoned and successful business man to invent to deceive another equally seasoned in affairs. Further, White admits he failed to inquire as to many of the important elements which would go into the equation if he really had been investigating from the seller the value of the stock, rather than doing as the case clearly indicates—merely attempting to buy at the market price a large block of stock and induce the seller to sell it on time. Kelly claims to have been deceived also. King and White are not in full agreement as to King's connection with the matter. Thwing says King was not present, as he

remembers. White clearly was not greatly surprised that the stock went down. On the first of May he had Hoyt arrange with Thwing for 10,000 shares at a lower price, on time again, and gave the same security. He made no complaint until the note fell due. He visited the property before the second transaction. In view of all the evidence, of which space does not permit a more detailed review, it is not surprising that the trial court found the transaction to be what the initial negotiations indicated it would be—a purchase on credit of stock at the market price on the faith and basis of that price. The deference due the finding of the trial court is to be added to the natural weight of the evidence, and when that is done, in any event, there is no reason for disturbing the finding made.

II. It is argued that the evidence shows that Thwing converted the stock by selling it in advance of the falling due of the note and that this entitles appellants to a credit for the amount realized. After the note fell **Credits: Conversion.** due 22,000 shares of the stock were duly sold and the proceeds credited. Whether there was a prior sale within the rule invoked by appellants depends upon strongly conflicting evidence. Without regard to that, the petition does not proceed upon any theory of conversion or set-off, equitable or otherwise, and the question is not in the case for that reason, also.

III. It is argued that the note is void because there was no compliance with the Blue-Sky Laws. [Sec. 11919 et seq., R. S. 1919.] The Union Oil Company had no license to do business in Missouri, and the Evans-Thwing Company had no permit under the law mentioned. Neither was an investment company in the sense of the statute. **Blue Sky Law.** The Union Oil Company sold no stock in Missouri so far as the evidence shows. It sold oil. Thwing made the sale in question and others. The stock was in his name. If the Evans-Thwing Company had an interest in the stock, it was an equitable one.

The petition does not allege it had an interest. It was not an investment company. Thwing held the legal title and made the sale, and he is the one made defendant in this case. There is no evidence that the Union Oil Company had any connection with the sale. Thwing made it, and it is not alleged that Thwing was acting for any other company which could come within the purview of the act. The Blue-Sky Law has no application.

IV. It is urged that since the evidence tends to show that the note in suit belongs in part to the Evans-Thwing Company respondent Thwing could not set up that part of the note as counterclaim. To whatever extent it is shown that the Evans-Thwing Company is the equitable owner of part of the note, it is to an equal extent shown that Thwing took and holds, in his name, the legal title therein for the Evans-Thwing Company. Under the statute (Secs. 837 and 980, R. S. 1919) and the decisions (Carter v. Butler, 264 Mo. l. c. 326, 327), Thwing could have sued on the note and enforced the security in behalf of his principal, and he is in no worse position to do so because he was first used by appellant as the owner of the note. Appellants' suit goes to the whole note and all the security. All the owners may resist that suit, and by counter-suit, enforce the obligation in all its parts. The cases denying the right to set up a joint claim as a counterclaim in a suit against a single party are not applicable.

**Counterclaim.**

V. It is contended that the fact that the court rendered a joint judgment and did not find the amount due the respective respondents requires a reversal. Rumsey v. People's Ry. Co., 144 Mo. 175, is cited. In that case, a suit to foreclose a mortgage securing one thousand bonds, numerous interveners set up their several claims. It was held that a joint judgment was erroneous. It also appeared that the judgment left the vital matter concerning the ownership of the respective bonds at sea. That is not this case.

**Joint Judgment.**

Here appellants sued three as owners of a note, and a joint judgment was rendered.

No objection, such as is now urged, was made in the trial court to the form of the judgment or the failure of the court to apportion the fund which would arise from it. Respondents cite applicable decisions. As was said in Barnes v. Midland Terminal Company, 218 N. Y. 91: "But if the referee fails to make the apportionment, and the plaintiffs are satisfied with a gross award, the defendant is not aggrieved. Collectively, the plaintiffs are the owners of every interest in this property affected by the nuisance. If the defendant pays them, it can never be required to pay anyone else. It is not concerned with the method in which they divide the money among themselves." The same rule is announced in Handly v. Snodgrass, 9 Leigh, l. c. 491; Wheeler v. Hawkins, 116 Ind. l. c. 522, 523; Am. F. Ins. Co. v. Landfare, 56 Neb. 482; School Districts v. Edwards, 46 Wis. 150. In this last case the court suggested that the court or a referee might ascertain the amounts due on apportionment. Appellants are in no position to urge this point.

VI. The rulings on evidence of which complaint is made need not be separately considered. It
Rulings on Evidence. is sufficient to say that the evidence affected by these rulings would not justify a different finding on the questions of fact.

The judgment is affirmed. All concur, except *Woodson, C. J.,* who dissents.